**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **LONNIE RUSSELL SHAW,** | |
| *Plaintiff,* | **CIVIL ACTION NO.** |
| **v.** | **5:21-cv-00145-TES** |
| **PEACH COUNTY,** *et al.,* | |
| *Defendants.* | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

This case arises from Plaintiff Lonnie Shaw's arrest and prosecution for allegedly pointing a gun at an officer who in turn shot him during the early morning hours of May 31, 2016. Following a trial, a jury found Plaintiff not guilty of aggravated assault on a police officer and possession of a firearm during the commission of a felony on April 26, 2019. *See* [Doc. 55-5]. After his acquittal, Plaintiff filed this lawsuit on April 26, 2021, and later amended his Complaint to allege a host of claims. [Doc. 1]; [Doc. 19]. Because the Court previously dismissed the vast majority of the counts in his Amended Complaint [Doc. 25], only his federal and state law claims for malicious prosecution against Defendants Brandon Williams, the deputy who shot him, and Terry Deese, the Peach County Sheriff, remain.

The Court now turns to Defendants' Motion for Summary Judgment [Doc. 38]

and Plaintiff's Motion for Partial Summary Judgment [Doc. 55]. For the reasons stated

below, **GRANTS** Defendants' motion, and **DENIES** Plaintiff's motion. [Doc. 38]; [Doc.

55].

## I. FACTUAL BACKGROUND

### A.    The Shooting

In the early morning hours of May 31, 2016, Plaintiff had almost fallen asleep in

his living room when he heard someone knocking at his door. [Doc. 61-6, pp. 5, 9].

Although exhausted after working around 12 hours on a farm the prior day, Plaintiff

nonetheless went to open the door and saw his stepson, Nick Coker. [*Id.* at pp. 6–7,

9:15–16]. When Nick said, "I need to talk to my mama," Plaintiff responded, "do you

have any idea what time it is[?]" [*Id.* at pp. 9–10]. Plaintiff testified that Coker has a

"bad drug problem," that Plaintiff had obtained a restraining order against him, and

that Coker is "in and out of jail all the time." [*Id.* at p. 10:1–12]. Plaintiff had dealt with

Coker many times before, stating that Coker "would want to start an argument every

time he would come," and that he probably called the Sheriff's Department three to five

times a week about Coker when he was not in jail. [*Id.* at pp. 10:15–16, 10:25, 11:1].

Coker eventually left Plaintiff's house, but Plaintiff went outside to make sure that

Coker didn't cut any of his tires or steal any tools from his truck. [*Id.* at pp. 14:1–6].

Because Plaintiff was scared that Coker would come back later that night, he walked

around for about an hour and went outside to put two chains on his gate. [*Id.* at pp.

14:13–14, 15:11–13, 15:23–24, 16:8–16]. Plaintiff finally went to sleep around 1:30 or 2:00 a.m. [*Id.* at p. 28:9–13, 29:14–15].

Fast forward a few hours, and Coker arrived at Peach County Medical Center (the "Medical Center") with a gunshot wound to his left leg. [Doc. 55-6, p. 3]. Peach County Sergeant Patrick Sondron responded to the Medical Center and observed Coker laying on a stretcher in a treatment room. [*Id.*]. Around this time, Deputy Williams also went to the hospital "to try to see what was going on." [Doc. 38-3, p. 6:10]. Deputy Sondron attempted to speak to Coker who claimed he didn't know where the shooting occurred. [Doc. 55-6, p. 3]. Deputy Sondron then asked if he shot himself and Coker stated "maybe." [*Id.*]. Coker cried out in pain during the entire time Deputy Sondron was at the Medical Center and did not rationally respond to any questions. [*Id.*].

While at the hospital, Deputy Sondron heard dispatch say the address "50 West Valley Drive," which is Plaintiff's address. [Doc. 55-6, p. 3]. Relying on this information from dispatch, "along with a previous dealing with a subject with the last name Coker," Deputy Sondron asked Deputy Williams to contact Deputy James Perry to go with him to 50 West Valley Drive. [*Id.*]; [Doc. 38, Exhibit D, Shoudel Interview of Williams, 2:00–2:18]. Deputy Williams then left the hospital to go to Plaintiff's house and met Deputy Perry at a Harvey's parking lot on the way to coordinate their approach. [Doc. 38-3, p. 11]. They arrived in separate vehicles at Plaintiff's residence around 3:00 a.m. [Doc. 38-3, p. 33].

When they arrived, Deputies Williams and Perry parked on the street in front of Plaintiff's house. [Doc. 38-3, p. 14]. Deputy Williams stated that he did not turn his sirens on because he "was just going to investigate." [*Id.* at p. 14:19–20]. However, he had a body microphone connected to his car camera ("dashcam"), which recorded the audio portion of the shooting that occurred moments after he and Deputy Perry got out of their vehicles. [*Id.* at pp. 17–19]. Before approaching Plaintiff's house, Deputy Williams contacted dispatch to see if they could call the residents of 50 West Valley Drive to let them know that he and Deputy Perry were there and to ask them to put up any animals they may have. [*Id.* at p. 24]. Deputy Williams testified that he thought dispatch responded once when he "was up at the door knocking already." [*Id.* at p. 24:9–12].

Upon their arrival, Deputies Williams and Perry unfastened a locked gate in front of the residence and proceeded onto the property, disregarding several posted signs, including a "No Trespassing" sign with Plaintiff's phone number written on it. [Doc. 61-6, pp. 14:25, 15:1–6, 16–19]. The deputies carried flashlights but did not unholster their firearms. [Doc. 38-3, p. 26]. As they got closer to the residence, they could hear loud voices (which turned out to be a television) as well as a dog barking inside. [*Id.* at p. 28]; [Doc. 50, Perry Depo., pp. 20–21]. Deputy Williams knocked on Plaintiff's door but did not announce that he or Deputy Perry were law enforcement officers. [Doc. 38-3, pp. 28, 31–33, 88]. Deputy Williams knocked several more times,

4

though not aggressively, after no one immediately came to the door. [*Id.* at pp. 31–32].

While the deputies knocked on their door, Plaintiff and his wife, Dawn Shaw, were asleep inside the house. [Doc. 72, D. Shaw Depo., pp. 27–28]. Dawn slept in her bed, and Plaintiff slept on the sofa in the living room. [*Id.*]; [Doc. 73, L. Shaw Depo., p. 77]. Dawn heard "beating on [her] front wall" and could tell that others were on their property. [Doc. 72, D. Shaw Depo., pp. 27:23, 28]. She then went to the living room to shake Plaintiff awake to let him know about possible trespassers. [*Id.* at pp. 27–28]; [Doc. 73, L. Shaw Depo., p. 81]. Plaintiff testified that when his wife woke him up, she "looked scared" and that he "was afraid" because "something had to be going on" for someone to be outside his house at 3:00 a.m. in the morning. [Doc. 61-6, pp. 32:15–25, 33:1–2, 33:18–21].

Well before the deputies arrived, Plaintiff had taken a Xanax and Oxycodone, and probably drank a couple of beers. [Doc. 72, D. Shaw Depo., pp. 29, 31]. When Dawn awoke Plaintiff, he "[had] no idea what she was saying," and later thought she said she was scared and heard something. [Doc. 73, L. Shaw Depo., p. 81:15–20]. Plaintiff then got his .32 pistol, put on a pair of pants, and went to the door to investigate. [*Id.* at pp. 82–83]. Plaintiff partially opened the door with his left hand, all the while keeping his handgun in his right hand. [Doc. 61-6, pp. 39–40, 62]. Plaintiff testified that he would not have taken his gun to the door had he known that law enforcement officers were outside, explaining that "if [he] had saw blue lights, a gun would never have entered

[his] mind." [Doc. 61-6, p. 38:22–23].

As soon as Plaintiff opened the door, the light on a pole near the end of the porch blinded him. [Doc. 73, L. Shaw Depo., p. 84]; [Doc. 61-6, p. 40:22-25, 41:1–4]. Plaintiff testified that "as soon as [his] eyes started coming back into focus after [he] opened the door, all [he] saw was what looked like a hand coming—reaching out." [Doc. 61-6, p. 41:10–12]. Deputy Williams shined a flashlight on Plaintiff's body and asked, "Hey, what's up? What happened?" [Doc. 38, Exhibit B, Merged Audio and Video]. Plaintiff said "I'm sorry," then leaned backwards into the house. [Doc. 38, Exhibit B, Merged Audio and Video at 00:55–01:10]; [Doc. 61-6, p. 41]. In a matter of about four seconds after Plaintiff opened the door, Deputy Williams pulled out his gun and shot Plaintiff in the chest. [Doc. 38, Exhibit B, Merged Audio and Video at 00:55–01:10]. Plaintiff fell, Deputies Williams and Perry then entered the house, and Deputy Williams stepped on the gun so Plaintiff or Dawn wouldn't get the gun. [Doc. 38-3, p. 146:14–16]. Deputy Perry "performed first aid" on Plaintiff and Deputy Williams called for an ambulance and reported the shooting. [Doc. 50, Perry Depo., pp. 30:22–25, 31].

**B.    The Aftermath of the Shooting**

Meanwhile, Investigator James Sutton, an on-call investigator for the Peach County Sheriff's Office, arrived at Plaintiff's residence in response to the suspected shooting of Nicolas Coker. [Doc. 51, Sutton Depo., pp. 20–21]. On the way to the scene, Sutton contacted Captain John Edwards, who said he would drive to the scene as well.

[*Id.* at p. 20:15–19]. And after Captain Edwards learned of the shooting involving

Plaintiff, he called the GBI to "go ahead and get them en route." [Doc. 64, Edwards

Depo., pp. 27:7–9, 28:14–16].

After arriving at the scene, Investigator Sutton stood on the firearm and directed

Deputies Williams and Perry to exit the residence. [Doc. 51, Sutton Depo., p. 22:6–7].

Investigator Sutton then spoke with Deputy Williams about the shooting while still on

the scene. [*Id.* at p. 26]. Investigator Sutton recalled that he had a short conversation

with Deputy Williams and that Deputy Perry "might have been somewhere right there

close by." [*Id.* at p. 26:4–5]. Deputy Williams told Investigator Sutton that when Plaintiff

answered the door, Plaintiff raised his gun, started bringing his gun up from behind his

leg, and pointed the barrel of his gun at him. [*Id.* at pp. 26:25, 27:1–2, 27:11–16]; [Doc. 43,

Williams Depo, pp. 28:18–25, 29:1–5, 32:5–7].

C.   **Deputy Williams's GBI Interview**

After the ambulance took Plaintiff to the Medical Center of Central Georgia,

Captain Edwards directed Deputies Williams and Perry to go to the Peach County

Sheriff's Office to wait for the GBI. [Doc. 64, Edwards Depo., p. 33:21–25]. After arriving

at the Peach County Sheriff's Office, Special Agent Jason Shoudel with the Georgia

Bureau of Investigation interviewed Deputy Williams a few hours after the shooting on

May 31, 2016. [Doc. 43, Williams Depo., pp. 23:12–16, 38–39]. Deputy Williams told

Agent Shoudel that prior to shooting Plaintiff, he saw the barrel of Plaintiff's gun come

towards him, and that Plaintiff "spun around." [Doc. 43, Williams Depo., pp. 39:24–25, 40:1–6]. Specifically, Deputy Williams said that Plaintiff turned around, moved to "have a better shot" at him and Deputy Perry, and lifted his gun which was in his right hand. [Doc. 38, Exhibit D, Shoudel Interview of Williams, 3:37–3:45, 10:50–12:24]. Deputy Williams fired his gun when he saw the "chrome" and "flash" of Plaintiff's gun and that he saw Plaintiff's gun "coming up." [*Id.* at 16:54–18:18]. He thought that Plaintiff was going to shoot him and Deputy Perry. [*Id.* at 39:35–47]. Deputy Williams also confirmed that he had "no doubt" that Plaintiff knew that he and Deputy Perry were police officers. [*Id.* at 49:00–49:40]. Deputy Williams again confirmed that after he shot Plaintiff, he and Deputy Perry entered the home, and he placed his foot on Plaintiff's gun so that neither Plaintiff nor his wife could grab it. [*Id.* at 26:59–27:21, 38:50–39:07].

### D.   The GBI Investigation

Sheriff Deese stated that while on scene that night, he made the decision that the Sheriff's Office would allow the GBI to conduct any investigation. [Doc. 79, Deese Depo., p. 14:2–9]; [Doc. 59, Peacock Depo., p. 13:16–19]. And, he also decided that the Sheriff's Office would not conduct an independent, internal investigation at the same time, because he was concerned that the Sheriff's Office "would have a conflict with two parallel investigations going on at the same time for the purpose of determining the same thing." [Doc. 79, Deese Depo., p. 14:6–9]. Sheriff Deese and his patrol commander, Major Kenny Cameron, "talked constantly during the GBI investigation" and worked

"side by side" investigating the incident "through updates from the GBI and everybody involved with the case." [*Id.* at pp. 11:7–15, 13:8–13, 13:24–25]. Also, while at the scene, Agent Tori Peacock (now McNeese) swore out an affidavit for a search warrant based on probable cause to believe that an aggravated assault had occurred when Plaintiff pointed his pistol at Deputy Williams. [Doc. 59, Peacock Depo., pp. 38–41]. After obtaining the search warrant, Agent Peacock and others viewed the security video of the incident on Plaintiff's security monitor there in Plaintiff's house. [*Id.* at pp. 49–58].

As the Court explains in great detail below, no one made the decision to immediately arrest Plaintiff. Critically, in the Court's opinion, Plaintiff was never arrested until after the GBI completed its investigation, turned the results of that investigation over to the District Attorney, the District Attorney decided to take the case to the Peach County Grand Jury, and the grand jury returned a true bill of indictment.

### E.      The Completion of the GBI Investigation and the District Attorney's Office's Decision to Prosecute Plaintiff

The GBI completed its investigation on September 19, 2016, and Agent Peacock released the GBI case file to Macon Judicial Circuit Assistant District Attorney ("ADA") Cynthia Adams. [Doc. 38-4]. On September 26, 2016, ADA Adams presented an indictment against Plaintiff to the Peach County Grand Jury in the case of *State v. Lonnie Shaw*, Indictment Number 16-CR-366. [Doc. 55-3]. After reviewing the GBI's investigative results, ADA Adams (and perhaps less directly, District Attorney David Cooke) made the decision to prosecute Plaintiff based on all the evidence the GBI had

gathered, including the video from Plaintiff's security system, Dawn Shaw's statements to the GBI, the GBI investigative summary compiled by Agent Peacock, and Peach County Sheriff's Department reports. [Doc. 47, Adams Depo., p. 19]; [Doc. 57, Cooke Depo., pp. 49, 67]. DA Cooke testified that everyone he spoke with in the GBI and the Sheriff's Office (even though it did not conduct a separate investigation) was "on the same page" in believing that Deputy Williams's shooting was not unreasonable under the circumstances. [Doc. 57, Cooke Depo., pp. 72–73].

The September 2016 indictment alleged Plaintiff committed aggravated assault on a peace officer in violation of O.C.G.A. § 16-5-21(d) for "*pointing* the said handgun at Deputy Brandon Williams . . . ." [Doc. 55-3, p. 2 (emphasis added)]. ADA Adams chose GBI Agent Tori Peacock to be the only witness to testify to the grand jury. [*Id.*]. After the Peach County Grand Jury returned a true bill of indictment, Plaintiff entered a plea of "Not Guilty" to the indictment on October 11, 2016. [*Id.*]; [Doc. 19-6, p. 2]. On September 28, 2016, a superior court judge granted a consent bond in the amount of $20,000 prepared by ADA Adams.[1] [Doc. 55-12, p. 2]. The consent bond also included "the special condition that the Defendant shall not be in possession of any firearms

---

[1] The undersigned signed the consent bond while he served as a superior court judge in the Macon Judicial Circuit. In an effort to be transparent, the Court reminded the parties that he had signed the bond and informed the parties that he did not recall the particular circumstances that lead to the bond. Although the Court gave the parties an opportunity to express any concerns with the Court presiding over this case, neither party lodged an objection. Further, the Court notes that another superior court judge handled all matters after December 31, 2016, the undersigned's last day in that office.

whatsoever, in any place whatsoever, to include his person, his home, and his vehicles." [*Id.*]; [Doc. 47, Adams Depo., p. 29].

On April 17, 2019, ADA Neil Halvorson filed a motion to nolle prosse the September indictment "because of the case being re-indicted under 18-CR-264." [Doc. 19-7, p. 2]. On August 7, 2018, ADA Halvorson re-indicted Plaintiff by presenting an updated indictment to the Peach County Grand Jury in the case of *State v. Lonnie Shaw*, Indictment Number 18-CR-264. [Doc. 55-4]. This superseding indictment alleged Plaintiff committed aggravated assault on a peace officer in violation of O.C.G.A. § 16-5-21(d), except this time for "*brandishing* said handgun towards Deputy Brandon Williams . . . ."[2] [*Id.* at p. 2 (emphasis added)]. DA Cooke stated that his office decided to change the indictment to say "brandishing" instead of "pointing" in the superseding indictment because "there was some discussion about [Plaintiff] holding [the gun] in some sort of threatening manner but not everybody was certain he pointed it." [Doc. 57, Cooke Depo., pp. 66–67]. The indictment also included an additional count alleging Plaintiff committed the offense of possession of a firearm during the commission of a felony in violation of O.C.G.A. § 16-11-106. [Doc. 55-4, p. 3]. This time, ADA Halvorson selected Captain Edwards to be the sole witness to the grand jury. [Doc. 55-4, p. 4].

---

[2] "A superseding indictment usually refers to an indictment that is returned while a valid indictment is still pending. A new indictment usually refers to an indictment returned after the pending indictment has been dismissed." *State v. Outen*, 324 Ga. App. 457, 459 n.1, 751 S.E.2d 109, 111 (2013), *aff'd but criticized*, 296 Ga. 40, 764 S.E.2d 848 (2014) (quoting *U.S. v. Italiano*, 894 F.2d 1280, 1282 n. 2 (11th Cir.1990)).

ADA Halvorson determined that Deputy Williams's apprehension of receiving immediate bodily injury as a result of a firearm justified his shooting Plaintiff, and he wouldn't have presented a bill of indictment had he thought otherwise. [Doc. 46, Halvorson Depo., p. 125]. The Peach County Grand Jury returned another true bill of indictment on August 7, 2018. [Doc. 55-4, p. 4]. On September 7, 2018, Plaintiff once again entered a plea of "Not Guilty" to both counts in Indictment No. 18-CR-264. [Doc. 19-8, p. 2].

Plaintiff's trial occurred April 24–26, 2019. Naturally, Deputy Williams testified about the shooting during Plaintiff's criminal trial. [Doc. 38-3]. At trial, Plaintiff's counsel asked Williams, "Lonnie Shaw never made a spin move before you shot him, did he, Deputy Williams?" [*Id.* at p. 114:4–5]. Williams responded, "[n]o, not going back watching the video. When I gave the interview to the GBI, like I said, it was just after the shooting, so everything was kind of foggy. With the spin move as he came up to raise the firearm I guess I anticipated him spinning on around, but I had the opportunity to shoot." [*Id.* at p. 114:6–10]. Finally, Plaintiff's counsel asked Williams, "[a]re you saying—so you agree that you did tell the GBI that [Shaw] did a spin move to get a shot off, correct?" [*Id.* at pp. 114:25, 115:1]. After Williams responded "[y]es, sir, I did," Plaintiff's counsel asked, "[a]nd are you saying on the stand now today that what you told the GBI was not true, was it?" [*Id.* at pp. 115:2–4]. Williams responded, "[l]ooking at the video, it's not. But at the time, that's what I believe happened." [*Id.* at

p. 115:2–6]. Deputy Williams later stated in his deposition that he would like to modify his testimony that he gave on April 25, 2019, to instead say that although Plaintiff did not make a "spin move," Deputy Williams is "100 percent sure [he saw] the weapon coming up at [him]." [Doc. 43, Williams Depo., pp. 50:10–14, 50:22–25, 51:16–22].

On April 26, 2019, the jury found Plaintiff "Not Guilty" on both counts. [Doc. 19-2, p. 2].

F.   **Relevant Procedural History**

On April 26, 2021, exactly two years after the jury acquitted Plaintiff of all charges in Indictment No. 18-CR-264, Plaintiff filed this suit alleging various federal and state law violations related to his shooting and subsequent prosecution. *See generally* [Doc. 1]. Upon review of Plaintiff's original Complaint [Doc. 1], the Court concluded that it was an impermissible shotgun pleading and ordered Plaintiff to recast his original Complaint to cure the deficiencies it outlined in its Order. [Doc. 18]. In response, Plaintiff filed an Amended Complaint [Doc. 19], which is now the controlling pleading in this action.

In his Amended Complaint, Plaintiff asserted Section 1983 claims against Deputies Williams and Perry for unreasonable search and seizure, the use of unreasonable and excessive force, and malicious prosecution. [Doc. 19, ¶¶ 83, 87]. Relatedly, he brought state law claims for trespass, assault, battery, false arrest, false imprisonment, intentional infliction of emotional distress, negligence, and malicious

13

prosecution against Deputies Williams and Perry. [*Id.* at ¶¶ 102–117, 134]. As to

Defendants Peach County, Sheriff Deese, and Major Cameron, Plaintiff asserted Section

1983 claims against them based on *Monell*[3] liability and supervisory liability for their

alleged failure to adequately hire, train, supervise, and discipline their employees and

agents. [*Id.* at ¶¶ 92–101]. He brought state law claims for malicious prosecution and

negligence against these Defendants as well. [*Id.* at ¶¶ 134–37]. Based upon the factual

allegations contained in Plaintiff's Amended Complaint, Defendants moved to dismiss

most of the claims brought against them, alleging that they were either barred by the

applicable statute of limitations or insufficiently pled. [Doc. 20]; [Doc. 20-1].

In its September 15, 2021 Order, the Court granted Defendants' Motion to

Dismiss Multiple Claims in Plaintiff's Amended Complaint. [Doc. 25]. The Court held

that all of Plaintiff's Section 1983 claims and state law claims were time-barred, except

for his malicious prosecution claims. [Doc. 25, pp. 10–20]. Additionally, the Court held

that Plaintiff's federal and state law claims for malicious prosecution lodged against

Deputy Perry failed to state a claim. [Doc. 25, pp. 20–21]. Following the Court's Order,

only Plaintiff's federal and state law claims for malicious prosecution against

---

[3] "*Monell v. Department of Social Services* holds that a municipality can be sued for damages under 42 U.S.C. § 1983 (1982) when 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers' or is 'visited pursuant to governmental custom even though such custom has not received formal approval through the body's official decision making channels.'" *Gilmere v. City Atlanta*, 737 F.2d 894, 901 (11th Cir. 1984) (quoting *Monell v. Dep't Services*, 436 U.S. 658, 690–91 (1978), *rev'g in part Monroe v. Pape*, 365 U.S. 167 (1961)).

Defendants Williams, Deese, and Cameron remained.[4]

## II. DISCUSSION

### A.   Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *U.S. v. Four Parcels Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437 (punctuation omitted). The movant may cite to particular parts of materials in the record, including "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A).[5]

---

[4] The Court's Order terminated Defendants Perry and Peach County from this action. [Doc. 25, p. 22]. Sadly, Major Cameron died during the pendency of this action. Because neither party submitted a motion for substitution as to Defendant Cameron within 90 days of his attorney's statement noting his death [Doc. 27], the Court **DISMISSES** Defendant Cameron from this case pursuant to Federal Rule of Civil Procedure 25(a)(1).

[5] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

"When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Josendis*, 662 F.3d at 1315 (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations and punctuation omitted). Further, where a party fails to address another party's assertion of fact as required by Federal Rule of Civil Procedure 56(c), the Court may consider the fact undisputed for the purposes of the motion. Fed. R. Civ. P.

56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."

*Anderson*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted). Stated differently, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. And "if a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at 1263.

"Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed . . . ." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (per curiam) (omission in original) (quoting *Bricklayers*

*Int'l Union, Loc. Union No. 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975)).

Cross motions may, however, "be probative of the non-existence of a factual dispute

when . . . they demonstrate a basic agreement concerning what legal theories and

material facts are dispositive." *Id.* at 1555–56 (citation omitted). Nevertheless, the Court

must evaluate each motion separately, "as each movant bears the burden of establishing

that no genuine issue of material fact exists and that it is entitled to judgment as a

matter of law." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538–39 (5th Cir.

2004) (citation omitted); *see also D & H Therapy Assocs. v. Bost. Mut. Life Ins.*, 640 F.3d 27,

34 (1st Cir. 2011) ("When there are cross-motions for summary judgment, the court

must consider each motion separately, drawing all inferences in favor of each non-

moving party in turn." (citation omitted)). "If there is no genuine issue and one of the

parties is entitled to prevail as a matter of law, the court may render summary

judgment." *Shaw Constructors*, 395 F.3d at 539 (citations omitted).

> ### B. Defendants' Motion for Summary Judgment
>
> #### 1. Federal Malicious Prosecution Claim Under Section 1983

Plaintiff argues that Defendants should be liable for malicious prosecution

because Deputy Williams's "false" statements to the GBI agent led to Plaintiff's

prosecution, Sheriff Deese ratified those statements, and no probable cause existed for

the indictment against Plaintiff. *See generally* [Doc. 55]; [Doc. 55-1]; [Doc. 55-2].

Defendants claim Deputy Williams cannot be liable for malicious prosecution against

Plaintiff because he did not maliciously prosecute Plaintiff, probable cause supported the alleged seizure Plaintiff experienced, and Deputy Williams is entitled to qualified immunity. *See generally* [Doc. 38]; [Doc. 38-1]; [Doc. 38-2]. Defendants also argue that Defendants Williams and Deese are entitled to official immunity on Plaintiff's state law claims for malicious prosecution. *See generally* [Doc. 38]; [Doc. 38-1]; [Doc. 38-2]. The Court agrees with Defendants.

### a.    Legal Standard: Malicious Prosecution Under Section 1983

Section 1983 creates no substantive rights. *See Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). Rather, it provides a vehicle through which an individual may seek redress when his federally protected rights have been violated by an individual acting under color of state law. *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994). To state a claim for relief under Section 1983, a plaintiff must satisfy two elements. First, he must allege that an act or omission deprived him of a right, privilege, or immunity secured by the U.S. Constitution or laws of the United States. *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995). Second, he must allege that the act or omission was committed by a state actor or a person acting under color of state law. *Id.*

For a Fourth Amendment malicious prosecution claim, Plaintiff must prove "he suffered a seizure pursuant to legal process that violated the Fourth Amendment . . . and satisfy the elements of the common law tort of malicious prosecution." *Luke v. Gulley*, 975 F.3d 1140, 1143 (11th Cir. 2020) (citation and internal quotation marks

omitted). The Supreme Court has identified the Fourth Amendment as the source of constitutional rights for "deprivations of liberty that go hand in hand with criminal prosecutions." *Albright v. Oliver*, 510 U.S. 266, 274 (1994) (emphasis added) (citation omitted); *see also Tinney v. Shores*, 77 F.3d 378, 381 (11th Cir. 1996) ("[A]n allegation of prosecution without probable cause must . . . be analyzed under the Fourth Amendment . . . ." (citation omitted)); *Jordan v. Mosley*, 298 F. App'x 803, 806 (11th Cir. 2008) (explaining that malicious prosecution "is an independent cause of action that potentially is cognizable under the Fourth Amendment") (citing *Uboh v. Reno*, 141 F.3d 1000, 1002–03 n.4 (11th Cir. 1998) (holding if malicious prosecution or abuse of process is committed by state actors and results in the arrest or other seizure of defendant, the defendant's only remedy is under the Fourth Amendment), *abrogated on other grounds by Nieves v. Bartlett*, 139 S. Ct. 1715, 1726 (2019)). Therefore, to advance his Fourth Amendment malicious prosecution claim, Plaintiff needs to demonstrate he suffered a seizure pursuant to legal process. *Luke*, 975 F.3d at 1143; *Dillard v. Lauderdale Cnty., Alabama*, No. 3:21-CV-00295-HNJ, 2022 WL 989023, at *14 (N.D. Ala. Mar. 31, 2022).

Recognizing the overlap between a Fourth Amendment violation pursuant to legal process and a common law malicious prosecution claim, the Eleventh Circuit explained that "[w]e can simplify our standard for malicious prosecution into two elements: the plaintiff must prove (1) that the defendant violated his Fourth Amendment right to be free from seizures pursuant to legal process and (2) that the

criminal proceedings against him terminated in his favor." *Luke*, 975 F.3d at 1144.

No one disputes that Plaintiff received a favorable termination of his charges for aggravated assault on a peace officer under O.C.G.A. § 16-5-21(d) and possession of a firearm during the commission of a felony under O.C.G.A. § 16-11-106. *See* [Doc. 19-2, pp. 2–3]. So, that only leaves the first element for the Court to address—that is, "(1) that the legal process justifying his seizure was constitutionally infirm and (2) that his seizure would not otherwise be justified without legal process." *Williams v. Aguirre*, 965 F.3d 1147, 1165 (outlining what a plaintiff must establish to show a violation of the Fourth Amendment right to be free from seizures pursuant to legal process). But, even if a court finds both elements present, the existence of "[p]robable cause renders a seizure pursuant to legal process reasonable under the Fourth Amendment[,] . . . [and] the presence of probable cause defeats a claim that an individual was seized pursuant to legal process in violation of the Fourth Amendment." *Washington v. Howard*, 25 F.4th 891, 898 (11th Cir. 2022) (internal quotation marks omitted).

> **b.**    **Plaintiff's Section 1983 claim against Deputy Williams fails because he has not shown that Deputy Williams caused his prosecution.**

The Court finds that Plaintiff has presented insufficient evidence that the grand-jury process was constitutionally infirm. *Williams*, 965 F.3d at 1165. Because Plaintiff cannot show that the legal process justifying his seizure was constitutionally infirm, the Court need not consider whether Plaintiff's alleged seizure would have otherwise been

justified. *Id.*

This case is somewhat factually unique. In the routine case found in this circuit's reporters (and those of its sister circuits), a defendant facing a claim of malicious prosecution is usually directly involved in the decision that led to the prosecution in question. For example, the typical law enforcement defendant personally seeks an arrest warrant for the plaintiff's arrest. Or, in other cases, the law enforcement defendant is the main (or only) source of information in an investigation that leads to a colleague applying for and obtaining an arrest warrant. But here, Deputy Williams never applied for an arrest warrant nor immediately arrested Plaintiff on the scene. Neither did Deputy Perry, Captain Edwards, Major Cameron, Sheriff Deese, or any other law enforcement officer. In fact, Plaintiff never spent a single minute in jail pursuant to *any* arrest warrant obtained by a law enforcement officer. He remained free while the GBI conducted its investigation and while the District Attorney reviewed the GBI's report prior to his ultimate decision to indict.

The Peach County Grand Jury ultimately returned true bills of indictment on September 26, 2016, and August 7, 2018. [Doc. 19-5]; [Doc. 19-1]. After the grand jury returned a true bill on September 26, 2016, the grand jury issued a special presentment bench warrant that authorized any law enforcement officer to arrest or seize Plaintiff. [Doc. 88-1]. When ADA Adams informed Plaintiff's attorney of the indictment, she ensured Plaintiff reported to the county jail for fingerprinting, booking, and immediate

release. *See* [Doc. 88-1]; [Doc. 88-2]. ADA Adams had already obtained a consent bond in the amount of $20,000 with the special condition that Plaintiff shall not possess "any firearms whatsoever." [Doc. 55-12]. It's unclear whether Plaintiff alleges the two-year period in which he could not possess firearms as his "seizure," or instead the brief time he spent in the Peach County Jail undergoing the fingerprinting and booking processes. Ultimately, the Court's decision doesn't turn on whether Plaintiff was sufficiently seized; the Court assumes, without deciding, that he was.[6]

Importantly, Plaintiff's allegations do not reveal how Deputy Williams's statements led to any *unlawful* seizure. The Fourth Amendment proscribes unreasonable seizures, and any seizure at issue here resulted from the grand-jury process,

---

[6] The Supreme Court has held that the tort of malicious prosecution "remedies detention accompanied . . . by *wrongful institution* of legal process." *Wallace v. Kato*, 549 U.S. 384, 390 (2007). "If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more. From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself." *Id.*, 549 U.S. at 390 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 11, p. 54, § 119, pp. 885–86 (5th ed.1984)). For a plaintiff to prevail on a malicious prosecution claim, a plaintiff must show a seizure "pursuant to legal process." *Black v. Wigington*, 811 F.3d 1259, 1267 (11th Cir. 2016) (quoting *Heck v. Humphrey*, 512 U.S. 477, 484, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994)). *But see Whiting v. Traylor*, 85 F.3d 581, 585–86 & n.7 (11th Cir. 1996) (holding that for the purposes of determining accrual, malicious prosecution is the common-law analogue to seizures without process that occur after the start of criminal proceedings), *abrogated by Wallace*, 549 U.S. at 389–90, 127 S.Ct. 1091 (holding that Fourth Amendment challenges to seizures without process adopt the rule of accrual for the tort of false imprisonment). *Williams*, 965 F.3d at 1158 (11th Cir. 2020). "A claim of malicious prosecution under the Fourth Amendment is only 'shorthand' for a claim of deprivation of liberty pursuant to legal process, so the validity of these claims depends on whether the seizure was justified . . . ." *Laskar v. Hurd*, 972 F.3d 1278, 1292 (11th Cir. 2020); *see also Crespo v. Georgia*, No. 21-11323, 2022 WL 1398124, at *3 (11th Cir. May 3, 2022).

particularly caused by Agent Peacock's testimony in 2016[7] and Captain Edwards's testimony in 2018 during the respective grand jury proceedings, as well as ADA Adams's and ADA Halvorson's independent prosecutorial decisions. [Doc. 19-5]; [Doc. 19-1].

Plaintiff cannot sustain his malicious prosecution claim upon a theory that Deputy Williams's statements provided the sole reason or legal cause for the prosecution and resulting seizure. In other words, Plaintiff's malicious prosecution claim against Deputy Williams fails on the issue of causation. Plaintiff has failed to point to evidence sufficient to show that the statements Deputy Williams gave to others on the scene and the GBI later that morning legally caused Plaintiff's seizure.

In *Williams*, the Eleventh Circuit explained that

[Plaintiff] can prove that his arrest warrant was constitutionally infirm if he establishes either that the officer who applied for the warrant should have known that his application failed to establish probable cause, or that an official, including an individual who did not apply for the warrant, intentionally or recklessly made misstatements or omissions necessary to support the warrant, . . . [*see*] *United States v. Leon*, 468 U.S. 897, 923 n.24, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (explaining that the requirements of the Fourth Amendment extend to officers "who provided information material to the probable-cause determination"); *Franks* [*v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)]; *Jones* [*v. Cannon*, 174 F.3d 1271, 1284–85 (11th Cir. 1999)] (applying this standard to a probable-cause hearing). As discussed above, [Plaintiff] need only prove that probable cause was absent for at least one of the two attempted [] charges that justified his seizure. And finally, he will prevail only if his seizure would

---

[7] By addressing the 2016 indictment, the Court makes no decision on whether the two-year statute of limitations passed so as to bar any claim at all regarding the 2016 indictment. However, Defendants have made no such argument in their motion.

not have been constitutional without legal process.

965 F.3d at 1165 (citations omitted).

One has to remember that Deputy Williams, the only remaining deputy from which Plaintiff seeks damages, never arrested Plaintiff, never seized him in any manner, nor sought a warrant for his arrest. Nor did he provide any misstatements or omissions necessary to another person seeking an arrest warrant—recall there is no arrest warrant. Moreover, Deputy Williams never testified before either grand jury. And, most critically, the Peach County Grand Jury does not transcribe its proceedings. Consequently, there is no record of the grand jury witnesses' testimony or the presentations made by the District Attorney's Office. Without such evidence, Plaintiff has no evidence that the grand jury based its decision to indict Plaintiff solely on Deputy Williams's statements. *See Williams*, 965 F.3d at 1167 (delineating causation as an issue for malicious prosecution claims) (citing *Baker*, 443 U.S. at 142 ("[A] public official is liable under § 1983 only if he causes the plaintiff to be subjected to [a] deprivation of his constitutional rights."); *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019) (explaining that the common-law elements of malicious prosecution require the plaintiff to prove that the defendants "caused damage to" him)).

The shooting occurred on May 31, 2016, and the District Attorney's Office presented its first bill of indictment to a grand jury on September 26, 2016, approximately four months after Williams shot Plaintiff. The GBI effectively began its

investigation the night of the shooting, after Captain Edwards called the GBI and Agent Shoudel interviewed Williams a few hours after he shot Plaintiff. The GBI completed its investigation on September 19, 2016, and then turned its file over to ADA Adams. [Doc. 38-4]. The District Attorney's Office made the choice to present a bill of indictment against Plaintiff after looking at all the evidence the GBI presented to it, and nothing in the record suggests that it solely relied on Williams's statements.

For example, the District Attorney analyzed the GBI report, Peach County Sheriff's Office Report, and other evidence, including statements made by Dawn Shaw. ADA Adams presented the first indictment on September 26, 2016, Agent Peacock was the only witness, and the grand jury issued a true bill after it heard all of the evidence, finding probable cause that Plaintiff committed aggravated assault. [Doc. 19-5]. ADA Halvorson presented the second indictment on August 7, 2018, Captain Edwards was the only witness, and after the grand jury heard all of the evidence, it issued a true bill once again. [Doc. 19-1]. Williams did not testify before either grand jury. The grand jury had a wide array of evidence before it and after considering all of it, it found probable cause to require Plaintiff to stand trial—twice. Plaintiff has failed to show that without Deputy Williams's testimony, the grand jury would not have indicted him.

Nothing about this process whispers a constitutional infirmity and the Court has found no relevant case showing otherwise. The GBI conducted an independent investigation and did not rely on Williams's testimony alone. Then, the GBI turned over

its findings to the District Attorney who made the independent decision to take the case to the grand jury. The grand jury considered all of the evidence and found probable cause to proceed. This is exactly how the grand jury process works in this country. The Court finds nothing about the process that the grand jury followed in this case to be constitutionally infirm. Thus, Plaintiff's claim against Deputy Williams necessarily fails.

Notwithstanding the analysis above, it is important to note that nothing in the record shows that Plaintiff was ever rebooked—and therefore, seized—because of the second indictment. Nothing in the record shows that the bond related to the first indictment was somehow carried over or applied to the second one. This fact alone begs the question of whether Plaintiff has any Section 1983 malicious prosecution claim at all. Because the record does not indicate that there was even a *de minimis* seizure related to the second indictment, it is unclear how Plaintiff could prevail on a malicious prosecution claim. However, giving Plaintiff the benefit of the doubt and assuming that the period Plaintiff was under the bond conditions constituted a seizure, Plaintiff's claim would still fail because probable cause, as found by two separate grand juries, supported the prosecution.[8]

---

[8] Plaintiff can only recover for any harm caused by his seizure, not the resulting prosecution, trial, stress, or any other process-related effect that was not part of his seizure. *See Williams*, 965 F.3d at 1167 ("Because Williams complains he was seized in violation of the Fourth Amendment, *the relevant injury is the seizure that followed the arrest warrant, not the broader prosecution*." (emphasis added) (citing *Whiting*, 85 F.3d at 584 ("[T]he Fourth Amendment protects against 'searches' and 'seizures' (and not 'prosecutions') . . . ."), *abrogated on other grounds by Wallace*, 549 U.S. at 389–90)); *Laskar*, 972 F.3d at 1297 ("In *Williams*, we held that *'the relevant injury' for a claim of malicious prosecution under the Fourth Amendment, 'is the seizure that followed the arrest warrant, not the broader prosecution*.'" (emphasis added) (quoting *Williams*, 965 F.3d at

c.    **Plecdoteff fails to show a lack of probable cause for the**
**prosecution.**

Plaintiff fails to show an absence of probable cause for his prosecution. A grand

jury found probable cause to support Plaintiff's prosecution both times the District

Attorney's Office presented a bill of indictment against him. This goes hand-in-hand

with the analysis above that Deputy Williams did not cause Plaintiff's prosecution.

As stated earlier, the existence of probable cause bars claims for malicious

prosecution. *See Williams*, 965 F.3d at 1157 (11th Cir. 2020) (indicating lack of probable

cause is necessary to prevail on a Section 1983 malicious prosecution claim). "Probable

cause does not require overwhelmingly convincing evidence, but only 'reasonably

trustworthy information.'" *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996)

(quoting *Marx v. Gumbinner*, 905 F.2d 1503, 1506 (11th Cir. 1990)). Finally, "[a]lthough

the absence of probable cause is undoubtedly a requirement for a claim of malicious

prosecution, questions about that requirement remain in our caselaw." *Williams*, 965

F.3d at 1159 (11th Cir. 2020).

Perhaps one of those remaining questions about the requirement that there be an

absence of probable cause is how courts should assess the existence of probable cause in

---

1167)). And "[a]lthough the common-law elements of malicious prosecution also require proof of damages, [the Eleventh Circuit has] long held that a 'plaintiff may recover *nominal* damages even though he suffers no compensable injury' . . . ." *Laskar*, 972 F.3d at 1285 (citations omitted). In other words, "a plaintiff's inability to prove actual damages is not determinative of whether he can state a claim for a constitutional violation." *Williams*, 965 F.3d at 1161 (citing *Slicker v. Jackson*, 215 F.3d 1225, 1231 (11th Cir. 2000) ("We have held unambiguously that a plaintiff whose constitutional rights are violated is entitled to nominal damages even if he suffered no compensable injury.")).

contexts like this one. That is, although Plaintiff alleges Deputy Williams maliciously prosecuted him, Deputy Williams did not arrest Plaintiff, his statements didn't form the sole basis for Plaintiff's prosecution, he did not decide to arrest Plaintiff, and Plaintiff's only alleged seizure—if any—was the short visit he made to the county jail for fingerprinting, booking, and immediate release. *See* [Doc. 88-1]; [Doc. 88-2]. Still, Plaintiff seeks to hold Deputy Williams liable for a seizure pursuant to legal process that Deputy Williams did not himself cause.

In any event, the Court has found no case that could support finding an absence of probable cause here, where the causal chain between Deputy Williams's statements and Plaintiff's seizure was broken (if there ever was one to begin with) by the District Attorney's independent decision to prosecute and critically, no initial arrest. We do not know what the ADAs or witnesses said to the grand jury because we have no transcripts of the grand jury proceedings. We do know, however, that the grand jury found probable cause to support the indictment because it issued a true bill of indictment both times. That is what led to Plaintiff's prosecution. And because the grand jury found probable cause to prosecute Plaintiff, Plaintiff's federal malicious prosecution claim simply cannot survive considering current Eleventh Circuit precedent.

To the extent Plaintiff argues that Deputy Williams acted unreasonably and without probable cause in making the statements he did to Agent Shoudel in his GBI

interview, that claim would also fail. First, the Court assumes, without deciding, that Deputy Williams did not intentionally lie to Agent Shoudel during his interview. However, even if he did, it is of no matter to our analysis whether Deputy Williams acted reasonably in responding to Agent Shoudel's questions, because those statements are not the cause of Plaintiff's alleged harm. This case is unlike others in which officers made statements that directly led to an arrest warrant, a warrantless arrest, or a seizure of any kind by an officer or based on statements made by another officer. *See Williams*, 965 F.3d at 1165; *see also Leon*, 468 U.S. at 923 n.24; *Franks*, 438 U.S. at 155–56; *Jones*, 174 F.3d at 1284–85.

In short, Plaintiff simply fails to prove that Deputy Williams caused the prosecution. Additionally, Plaintiff fails to offer evidence disputing the existence of probable cause. These, taken together, are fatal to Plaintiff's Section 1983 malicious prosecution claims.

### 2. <u>Deputy Williams is entitled to qualified immunity.</u>

Notwithstanding the above finding, the Court continues to evaluate Deputy Williams's assertion of the affirmative defense of qualified immunity. *See Ansley v. Heinrich*, 925 F.2d 1339, 1342 (11th Cir. 1991). "Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sherrod v. Johnson*, 667 F.3d 1359, 1363

(11th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Still, "when a defendant moves for summary judgment based on the doctrine of qualified immunity, the court must view the facts in the light most favorable to the plaintiff." *Hardin v. Hayes*, 957 F.2d 845, 848 (11th Cir. 1992).

To claim qualified immunity, a defendant must first show he was performing a discretionary function. *Moreno v. Turner*, 572 F. App'x 852, 855 (11th Cir. 2014). Plaintiff has not disputed that Deputy Williams was acting within the scope of his discretionary authority at all relevant times, specifically including when he answered Agent Shoudel's questions during the recorded GBI interview following the shooting.

"Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply." *Edwards v. Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting *Lewis v. City W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009)). A plaintiff demonstrates that qualified immunity does not apply by showing "(1) the defendant violated a constitutional right, and (2) [the] right was clearly established at the time of the alleged violation." *Moreno*, 572 F. App'x at 855 (quoting *Whittier v. Kobayashi*, 581 F.3d 1304, 1308 (11th Cir. 2009)). The "clearly established" requirement may be met by one of three showings: (1) a materially similar case has already been decided; (2) an accepted general principle should control the novel facts of the case with obvious clarity; or (3) the conduct in question so obviously violated the Constitution that no prior case law is necessary. *Loftus v. Clark-Moore*, 690 F.3d 1200,

31

1204–05 (11th Cir. 2012).

Plaintiff fails to show that qualified immunity does not apply to Deputy Williams because he has failed to show Deputy Williams violated one of Plaintiff's constitutional rights. As stated above, Deputy Williams did not cause Plaintiff's prosecution, and therefore he could not have violated Plaintiff's Fourth Amendment rights under a malicious prosecution analysis. The grand jury's finding of probable cause precludes Plaintiff's Section 1983 malicious prosecution claim. Because Plaintiff cannot show that Deputy Williams violated his constitutional rights under the Fourth Amendment, the Court need not consider whether that right was "clearly established" on the date of the alleged violation.

Plaintiff has not proven facts to show that Williams's statements—false or otherwise—formed the sole foundation to the probable cause needed for the prosecution. Accordingly, Deputy Williams is entitled to qualified immunity, and Plaintiff's federal law malicious prosecution claim against Defendant Williams cannot survive summary judgment.

### 3.   Sheriff Deese is not liable for malicious prosecution under Section 1983.

Finally, Plaintiff attempts to hold Sheriff Deese liable under the federal tort of malicious prosecution as well. However, Sheriff Deese doesn't address whether qualified immunity protects him; instead, he only argues that he's entitled to official immunity for Plaintiff's state law claim of malicious prosecution discussed below. In

any event, Plaintiff argues that Sheriff Deese failed to ensure the Peach County Sheriff's Office conducted a reasonable investigation into the circumstances surrounding the shooting. [Doc. 55, p. 2]. The Court finds it unclear how Plaintiff could hold Sheriff Deese liable for malicious prosecution. Sheriff Deese did not charge Plaintiff with any offense, nor did he provide any statement that served as the basis of Plaintiff's prosecution. Tellingly, Sheriff Deese told ADA Halvorson that he "didn't understand why they were . . . wanting to prosecute [Plaintiff] for it because [he] thought [Plaintiff had] been punished enough." [Doc. 44, Deese Depo., p. 21].

To the extent Plaintiff's claim is based on a theory that Sheriff Deese failed to train Deputy Williams, the Court already dismissed his failure-to-train claim. [Doc. 19, ¶ 132]; [Doc. 25]. To the extent Plaintiff's claim is based on a theory that Sheriff Deese is vicariously liable or liable under *respondeat superior*, that theory is an official capacity claim, and Plaintiff has only sued Sheriff Deese in his individual capacity. "[S]upervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1047–48 (11th Cir. 2014) (citation omitted). Rather, a plaintiff must show that "the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." *Id.* A plaintiff may establish a causal connection by showing that: "(1) a history of widespread abuse puts the responsible supervisor on notice of the

need to correct the alleged deprivation and he fail[ed] to do so; (2) the supervisor's

improper custom or policy le[d] to deliberate indifference to constitutional rights; or (3)

facts support an inference that the supervisor directed the subordinates to act

unlawfully or knew that the subordinates would act unlawfully and failed to stop them

from doing so." *Hendrix v. Tucker*, 535 F. App'x 803, 805 (11th Cir. 2013) (citing *Douglas*

*v. Yates*, 535 F.3d 1316, 1322 (11th Cir.2008)) (punctuation omitted). Plaintiff has failed to

show a causal connection between any alleged act or omission on the part of Sheriff

Deese and Plaintiff's prosecution by any of these means.

To the extent Plaintiff is arguing that Sheriff Deese's policies caused Plaintiff's

prosecution, this argument simply fails. Sheriff Deese allowed the GBI to conduct an

independent investigation into whether Deputy Williams acted reasonably and

appropriate on the night in question. As shown above, the GBI's findings and other

evidence available to the grand jury led to Plaintiff's prosecution, not just Williams's

interviews. Notwithstanding this, Sheriff Deese couldn't be held liable because there

was no underlying constitutional violation at all. *See Mann v. Taser Int'l, Inc.*, 588 F.3d

1291, 1308 (11th Cir. 2009); *see also Taylor v. Taylor*, 649 F. App'x 737, 747–48 (11th Cir.

2016).

### 4.   State Law Claim for Malicious Prosecution

Plaintiff also asserts claims against Deputy Williams and Sheriff Deese under a

state law theory for malicious prosecution. However, these claims face the same fate as

their federal counterparts. For such a claim, Plaintiff must prove: "(1) prosecution for a criminal offense; (2) instigated without probable cause; (3) with malice; (4) under a valid warrant, accusation or summons; (5) which has terminated favorably to the plaintiff; and (6) has caused damage to the plaintiff." *Barnette v. Coastal Hematology & Oncology, P.C.*, 670 S.E.2d 217, 220 (Ga. Ct. App. 2008); *see Condon v. Vickery*, 606 S.E.2d 336, 339 (Ga. Ct. App. 2004) (affirming grant of summary judgment where plaintiff could not prove one element of malicious prosecution claim). "The requisite malice may be inferred from a *total* lack of probable cause. Thus, the gravamen of the complaint is the absence of probable cause on the part of the person instituting the prosecution." *Barnette*, 670 S.E.2d at 220 (citations and internal alterations and punctuation omitted) (emphasis in original).

Plaintiff argues a jury could find he was maliciously prosecuted because Deputy Williams's false statements about the shooting, and Sheriff Deese's ratification of those statements, caused his prosecution. Plaintiff also argues "that there was no probable cause to charge [him] criminally." [Doc. 55-2, p. 15]. Defendants argue there is no evidence of actual malice on the part of Deputy Williams in making statements to the GBI or on the part of Sheriff Deese for allegedly ratifying Deputy Williams's comments. Defendants also claim they are protected by official immunity in their individual capacities. Again, the Court agrees with Defendants.

For the purposes of Plaintiff's state law claims, he fails to meet two elements: (1)

that the process lacked probable cause, and (2) that Defendants acted with malice. *See Barnette*, 670 S.E.2d at 220. The first missing element—probable cause—is established at length above. After considering all of the available evidence, the grand jury found probable cause to believe that Plaintiff committed a crime.

For the second, Plaintiff contends that Defendants acted with malice. To support that claim, Plaintiff argues that Defendants acted maliciously because they acted without any probable cause. It is true that, "[t]o state a malicious prosecution claim" under Georgia law "the plaintiff must show that the defendant acted 'maliciously and without any probable cause.'" *Davis v. Lang*, 706 F. App'x 551, 557 (11th Cir. 2017) (citing O.C.G.A. § 51-7-40 and *Anderson v. Cobb*, 258 Ga. App. 159, 160 (2002)). One way to infer malice for purposes of a malicious prosecution claim is from "a 'total lack of probable cause.'" *Davis*, 706 F. App'x at 557 (citing O.C.G.A. § 51-7-44 and *Jones v. Warner*, 301 Ga. App. 39, 41 (2009)). Here, Plaintiff cannot rely on the lack of probable cause to infer malice, so he must offer some other form of evidence. He fails to carry that burden.

Notwithstanding Plaintiff's failure to establish the elements for state-law malicious prosecution, he faces another problem. Under Georgia's doctrine of official immunity, state public officials generally cannot be held personally liable for discretionary acts performed within the scope of their official authority. *Cameron v. Lang*, 274 Ga. 122, 549 S.E.2d 341, 344 (2001). However, public officials will not receive

official immunity if "they act with actual malice or with actual intent to cause injury in the performance of their official functions." Ga. Const. Art. I, § 2, ¶ IX(d); *Murphy v. Bajjani*, 282 Ga. 197, 647 S.E.2d 54, 60 (2007). In the context of official immunity, actual malice means "a deliberate intention to do wrong" or "the intent to cause the harm suffered by the plaintiff[]." *Murphy*, 647 S.E.2d at 60. To show actual malice, a plaintiff must allege facts that evince more than "the reckless disregard for the rights or safety of others," *id.* at 60, and more than "deliberate indifference," *Williams v. Fulton Cnty. Sch. Dist.*, 181 F. Supp. 3d 1089, 1145 (N.D. Ga. 2016).

Under Georgia law, "actual malice," as used in the doctrine of official immunity, is conceptually distinct from the generic form of malice required to state a malicious prosecution claim. "In the context of official immunity, actual malice requires a deliberate intention to do wrong . . . . Ill will alone is insufficient to establish actual malice[.]" *Stephens v. Zimmerman*, 333 Ga. App. 586, 591, 774 S.E.2d 811, 816 (2015) (alterations adopted and citations omitted). In other words, Plaintiff must show Defendants Williams and Deese "acted with the deliberate intent to commit a wrongful act or with the deliberate intent to harm him." *Id.* (citations and punctuation omitted). "Actual malice does not include implied malice or the reckless disregard for the rights and safety of others." *Id.* (citation omitted).

Under the doctrine of official immunity, "actual malice requires more than showing that the defendant police officer lacked probable cause." *Davis*, 706 F. App'x at

557. "Actual malice" in the official immunity context means "a deliberate intention to do wrong or the intent to cause the harm suffered by the plaintiffs." *Id.* (quoting *Murphy*, 647 S.E.2d at 60). The threshold for showing actual malice is high. For example, "the record may support an inference of actual malice where there is evidence indicating that the police officer arrested the plaintiff despite having clear proof that the plaintiff did not commit the crime for which he was arrested." *Id.*

Plaintiff cites no evidence showing Deputy Williams harbored animus towards him. Even assuming Deputy Williams's statements to Agent Shoudel were false, the First Amended Complaint fails to prove that he intentionally gave false testimony in a deliberate effort to harm Plaintiff, which is required for a finding of actual malice. *Davis*, 706 F. App'x at 557. Because Plaintiff has failed to show the possibility of actual malice strong enough to overcome Defendants' official immunity against this claim, Plaintiff's state law claim for malicious prosecution against Deputy Williams is not viable.

And as stated earlier in the federal-law analysis, it is unclear how Sheriff Deese is liable for malicious prosecution. To the extent Plaintiff is asserting this claim under a theory of *respondeat superior*, such claims are official capacity claims, and Deese has only been sued in his individual capacity. [Doc. 25, p. 1]; *Seay v. Cleveland*, 270 Ga. 64, 508 S.E.2d 159, 161 (1998). Plaintiff cannot show that Sheriff Deese's decision to allow the GBI to investigate, or Sheriff Deese's creation of any policy, was done with the requisite actual malice to show malicious prosecution under Georgia law or to overcome official

immunity. Neither Deputy Williams nor Sheriff Deese made the decision to prosecute Plaintiff. [Doc. 47, Adams Depo., p. 19]. Neither Deputy Williams nor Sheriff Deese testified before either grand jury. [Doc. 43, Williams Depo., p. 71]; [Doc. 47, Adams Depo., p. 18]; [Doc. 61, Halvorson Depo., p. 129]. Additionally, neither Deputy Williams nor Sheriff Deese had any input as to what evidence was introduced in the grand jury proceedings. [Doc. 61, Halvorson Depo., p. 133]; [Doc. 57, Cooke Depo., p. 122].

The undisputed facts establish that Plaintiff failed to prove all of the elements for malicious prosecution under Georgia law as to Deputy Williams and Sheriff Deese. Thus, the Court **GRANTS** Defendants' Motion on these claims.

B.    <u>**Plaintiff's Motion for Partial Summary Judgment**</u>

As discussed above, because Plaintiff has not demonstrated that Defendants violated one of his constitutional rights, Defendants are entitled to qualified immunity with regard to Plaintiff's Section 1983 claim. Additionally, because Plaintiff has failed to prove all the elements for malicious prosecution under Georgia state law, Defendants are entitled to official immunity with regard to Plaintiff's malicious prosecution claim under Georgia state law. Accordingly, the Court **DENIES** Plaintiff's Partial Motion for Summary Judgment [Doc. 55].

<u>**III. CONCLUSION**</u>

Based on the foregoing, the Court **GRANTS** Defendants' Motion for Summary Judgment [Doc. 38] and **DENIES** Plaintiff's Motion for Partial Summary Judgment

[Doc. 55]. The Court **DIRECTS** the Clerk of Court to enter **JUDGMENT** accordingly.

**SO ORDERED**, this 3rd day of November, 2022.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**